# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DAVID NEIL SMITH, Mundford, Norfolk, England, United Kingdom,<br><br>        Plaintiff-Petitioner,<br><br>v.<br><br>VICKIE MICHELLE SMITH, Caldwell, Idaho, United States of America,<br><br>        Defendant-Respondent. | Case No. 1:17-CV-489-BLW<br><br>**FINDINGS OF FACT, CONCLUSIONS OF LAW & ORDER** |

## INTRODUCTION

The Court held a bench trial on January 29, 2018, in this matter, and the parties filed post-trial briefs on February 9, 2018. The matter is now at issue. For the reasons explained below, the Court finds that the minor child DMS must be returned to the United Kingdom under Article 12 of the Hague Convention.

## FINDINGS OF FACT

The Smiths were married in 1997 and resided in England. Vickie is a citizen of the United States; David is a citizen of the United Kingdom. While residing in England, they had two children, DOS. (now age 16) and DMS (now age 15). Nearly twenty years later, the marriage broke down and David filed for divorce. The court in England granted primary custody of the children to Vickie while David received visitation rights. Vickie initially filed a motion with the English court to remove the boys permanently from the jurisdiction but withdrew that motion, *see Order (Dkt. No. 1-5)* at p. 3, and represented to

**Findings of Fact & Conclusions of Law & Order – p. 1**

the court, through her solicitor, that "she will not remove the children from the jurisdiction without the agreement of [David Smith]." *See Order (Dkt. No. 1-6)* at p. 2.

On May 30, 2017, Vickie, a United States citizen, absconded with DMS to the United States without David's permission, and without approval of the English court, leaving behind her other child DOS. Vickie and DMS lived briefly in Colville, Washington, where his mother's siblings lived, and then moved in with various other family members, and for a short time, lived in a homeless shelter. Since August of 2017, Vickie and DMS have lived in Caldwell, Idaho, with a childhood friend of Vickie's. Vickie works part-time at a convenience store in Nampa. DMS has completed the first semester of his sophomore year at Caldwell High School, and recently began his second semester.

To regain custody of DMS, David initiated proceedings in the English court to compel Vickie to return DMS to England. The court did not grant the requested relief because it was unclear whether Vickie had notice of the petition, but the court did grant leave to David to restore his application once Vickie received notice. *See Order (Dkt. No. 1-10)* at p. 2. The court did "note", however, that (1) in earlier proceedings, Vickie had "assured the Court (through her instructed solicitor) that she would not remove the children (or either of them) from the jurisdiction without the agreement of the Applicant father, such assurance being recorded on the face of the order"; (2) that Vickie was "in breach" of the custody orders; and (3) that the "removal of [DMS] from the jurisdiction of England and Wales, and his retention outside the jurisdiction is wrongful within the meaning of Article 3 of the Hague Convention 1980." *Id.* at p. 2.

**Findings of Fact & Conclusions of Law & Order – p. 2**

David filed a complaint against Vickie in this Court on November 30, 2017, alleging that her removal of DMS was wrongful under Article 3 of the Hague Convention, and asking for an Order that DMS be returned to England. On December 6, 2017, this Court issued an *ex parte* temporary restraining order (TRO) enjoining Vickie from removing DMS from Idaho pending a hearing on the complaint's request to return him to England. That evidentiary hearing has now been held, and the case is ready to be resolved.

## CONCLUSIONS OF LAW

The United States and the United Kingdom are signatories to the Hague Convention on the Civil Aspects of International Child Abduction. The goal of the Convention is "to secure the prompt return of children wrongfully removed to or retained in any Contracting State; and . . . to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." *See* Hague Convention, art. 1. The Signatories perceived that parents were wrongfully taking their children across international lines "in search of a more sympathetic court" for custody proceedings. *Von Kennel Gaudin v. Remis,* 282 F.3d 1178, 1181 (9th Cir. 2002). The Convention sought to eliminate this motivation by allowing for the prompt return of abducted children. *Id.* at 1182. Congress implemented the Convention through the International Child Abduction Remedies Act (ICARA).

### Wrongful Removal

To prevail under ICARA, David must show that DMS was "wrongfully removed" by Vickie "within the meaning of the [Hague] Convention." *See* 22 U.S.C. § 9003

**Findings of Fact & Conclusions of Law & Order – p. 3**

(e)(1)(A). Generally, a court must return a wrongfully abducted child. *Von Kennel,* 282 F.3d at 1182. The Convention does not extend to custody determinations but simply restores the pre-abduction status quo by allowing for the return of a wrongfully abducted child. Id. The Convention, in Article 3, states that a child's removal is "wrongful" if "it is in breach of rights of custody" under the law of the jurisdiction where "the child was habitually resident immediately before the removal . . . ." *See* Hague Conv. Art. 3. In determining whether Article 3 applies, the Ninth Circuit has held that a court must answer four questions: "(1) When did the removal or retention at issue take place? (2) Immediately prior to the removal or retention, in which state was the child habitually resident? (3) Did the removal or retention breach the rights of custody attributed to the petitioner under the law of habitual residence? (4) Was the petitioner exercising those rights at the time of the removal or retention?" *Papakosmas v. Papakosmas,* 483 F.3d 617, 622 (9th Cir. 2007).

David has carried his burden of proving that (1) DMS was removed in May of 2017; (2) at that time, DMS was habitually residing in England; (2) the removal breached Vickie's assurance to the court that she would not remove DMS without David's consent; and (3) David was exercising his custodial rights at the time of the removal.

To put a finer point on item (2) above, Vickie deliberately violated the child custody arrangement set forth in the United Kingdom court by bringing DMS to the United States without permission and without any notice to either the court or David. Vickie's claim that an unnamed policeman told her she was excused from complying with the London court custody order by a domestic violence law is not credible. It is

**Findings of Fact & Conclusions of Law & Order – p. 4**

highly unlikely that any policeman would give complex legal advice that might expose the recipient to the serious consequences of violating a court order. Surely any police officer giving such advice would have made some record of it, but a search of police records revealed nothing. Moreover, any reasonable person receiving such advice would get it in writing, given the serious consequences that follow from violating a court order. But Vickie – who compulsively ensured that other matters were confirmed in writing – never had the police memorialize this crucial advice. While she did proffer an email from an Officer Green, he was not the officer who had earlier provided the advice, and in the email he neither repeats the advice nor confirms that it was earlier given. *See* Exhibit 2007.

With regard to item (3) above, the Court finds that David was exercising his custodial rights at the time of removal. The English law does not use the word "custody" but instead speaks of "parental responsibility," which is defined as "all the rights, duties, powers, responsibilities, and authority which by law a parent of a child has in relation to the child and his property." *See Haimdas v. Haimdas,* 720 F.Supp.2d 183, 202 (E.D.N.Y. 2010) (quoting the United Kingdom Children Act of 1989). A finding that a parent exercised parental responsibility under this English law has been deemed to support a finding that he has exercised his custodial rights under the Hague Convention. Id. Here, David was current in his child support payments, provided a home for DMS, and cooked meals during the times he had contact periods. He was exercising his parental responsibilities.

David has carried his burden of showing each of the elements necessary for a finding that DMS was wrongfully removed under the Hague Convention and the ICARA. The Court now turns to the two defenses raised by Vickie.

**Mature Child Defense**

Upon a showing of wrongful removal, the child shall be returned to his habitual residence unless the removing parent carries her burden of proving an affirmative defense under Article 13 of the Convention. Here, Vickie Smith has raised the mature child defense. To prevail on this defense, she must establish by a preponderance of the evidence that (1) the child has "attained an age and degree of maturity at which it is appropriate to take account of its views" and (2) "the child objects to being returned." *See* Hague Convention art. 13; *Custodio v. Samillan*, 842 F.3d 1084, 1089 (8th Cir. 2016). "[T]he courts must narrowly interpret the exceptions lest they swallow the rule of return." *Asvesta v Petroutsas,* 580 F.3d 1000, 1003-04 (9th Cir. 2009).

The policy behind the mature child defense was explained in the official Hague Conference Explanatory Report, which is recognized "as the official history and commentary on the Convention and is a source of background on the meaning of the provisions of the Convention." *Mozes v. Mozes,* 239 F.3d 1067, 1069 n. 3 (9th Cir. 2001). The Report provides this guidance to the Court:

> [T]he Convention also provides that the child's views concerning the essential question of its return or retention may be conclusive, provided it has, according to the competent authorities, attained an age and degree of maturity sufficient for its views to be taken into account. In this way, the Convention gives children the possibility of interpreting their own interests. Of course, this provision could prove dangerous if it were applied by means of the direct questioning of young people who may admittedly have a clear

> grasp of the situation but who may also suffer serious psychological harm if they think they are being forced to choose between two parents. However, such a provision is absolutely necessary given the fact that the Convention applies, *ratione personae*, to all children under the age of sixteen; the fact must be acknowledged that it would be very difficult to accept that a child of, for example, fifteen years of age, should be returned against its will.

Pérez-Vera, *Explanatory Report: Hague Convention on Private International Law* at ¶ 30 (1981). However, "a child's objection to being returned may be accorded little if any weight if the court believes that the child's preference is the product of the abductor parent's undue influence over the child." *See* 51 Fed. Reg. at 10,510. Such influence need not be intentional or sinister; it may simply result from the child's retention by one parent. *Zaragoza Gutierrez v. Juarez,* 2017 WL 3215659 (D. Ariz. July 28, 2017).

Even if Vickie Smith meets her burden of proving the mature child defense, the Court has the discretion to refuse to apply the defense and "order the return of the child if it would further the aim of the Convention which is to provide for the return of a wrongfully removed child." *Asvesta,* 580 F.3d at 1004; *see also* Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. at 10,509 ("The courts retain the discretion to order the child returned even if they consider that one or more of the exceptions applies.").

In this case, the Court asked DMS a lengthy series of questions designed to determine his maturity level and his desires. The Court was impressed with his intelligent and articulate answers. On the basis of that colloquy, the Court finds (1) that DMS is mature enough that the Court should take his desires into account, and (2) that DMS desires to remain in the United States. Given these findings, and the authority

**Findings of Fact & Conclusions of Law & Order – p. 7**

quoted above, it would be "very difficult" to return a child the age of DMS against his will.

At the same time, DMS has not acquired close friendships here, and spends much of his free time doing solitary indoor activities, which is what he did in the United Kingdom. There is no evidence that he is having unique experiences here that he could not have in the United Kingdom. He had no strong pre-removal desire to come to the United States, but testified that he made up his mind to leave with his mother just prior to coming here. Importantly, he testified that if he was returned to the United Kingdom, he was not sure whether he would return to the United States when he turned sixteen.

DMS's desire to remain here has been powerfully influenced by Vickie's very strong desire to remain here, as is discussed further below. While the Court cannot find that Vickie has *unduly* influenced DMS, the Court finds that his desire to remain here is largely tied to Vickie's desire and is not a strongly held independent desire.

These findings mean either that (1) the mature child defense has not been proven; or (2) the bare minimum elements of the mature child defense have been proven, but DMS's tepid and dependent desire cannot override the transcendent aim of the Hague Convention to return a minor child wrongfully removed. Either way, the Court finds that the mature child defense does not prevent removal.

**Grave Risk Defense**

Vickie argues that sending DMS back to the United Kingdom would create a grave risk to him. Article 13(b) contains an exception to return when "there is a grave risk that [the child's] return would expose the child to physical or psychological harm or

**Findings of Fact & Conclusions of Law & Order – p. 8**

otherwise place the child in an intolerable situation." This defense is to be interpreted narrowly, and even if proven, "a federal court retains, and should use when appropriate, the discretion to return a child . . . if return would further the aims of the Convention." *Asvesta v Petroutsas,* 580 F.3d 1000, 1003-04 (9th Cir. 2009). Moreover, in considering the grave risk defense, the Court "should not consider matters relevant to the merits of the underlying custody dispute such as the best interests of the child, as these considerations are reserved for the courts of the child's habitual residence." *Id.*

Under this defense, Vickie Smith must show, by clear and convincing evidence, that DMS, if returned to London, would experience "something greater than would normally be expected on taking a child away from one parent and passing him to another." *Id.; Cuellar v. Joyce,* 596 F.3d 505, 509 (9th Cir. 2010). A grave risk of harm under The Hague Convention occurs when the child faces "a real risk of being hurt, physically or psychologically, as a result of repatriation." *Id.* (quoting *Blondin v. Dubois,* 238 F.3d 153, 162 (2d Cir.2001)).

The Court finds no evidence of a grave risk. If the Court orders DMS returned to the United Kingdom, and Vickie accompanies him, the custody order would remain in effect, granting primary custody to Vickie. In that case, the issue becomes whether David's visitation rights will create a grave risk to DMS. After nearly twenty years of marriage, nothing was presented to the London court to dissuade it from allowing David those visitation rights. This narrows the issue even further: Has a grave risk arisen in the months since that order? While David did have a physical altercation with his other son, it was limited to a single incident, and they have since reconciled.

**Findings of Fact & Conclusions of Law & Order – p. 9**

Even if Vickie chooses to remain here and not accompany DMS, the Court cannot find a grave risk is posed by David having sole custody. Vickie has claimed abuse but several investigations by the police and military officials found no evidence to support those claims. If David was abusive, why did Vickie agree to leave DOS with David, and why did DOS, even after the single scuffle with David, express his desire to stay with David? It is telling that DOS has positive views of David. *See Exhibit 1010* at pg. 8.

Dr. Sheila Sturgeon Freitas, a licensed clinical psychologist, did testify that she had a reasonable suspicion that DMS's interactions with his father rose to the level of psychological maltreatment. But she interviewed DMS for less than an hour – roughly the same amount of time the Court spent with him – and did not do a formal assessment, which would typically involve interviewing the parents. Moreover, Dr. Freitas was not aware of the grave risk standard the Court must apply, and so did not evaluate the severity of the maltreatment she suspected. Indeed, her evaluation seemed to be focused on determining the best interests of DMS, an inquiry forbidden to the Court and unhelpful to the grave risk analysis.

A more detailed assessment was done by CAFCASS, a social services agency appointed by the UK court to evaluate the children's living situation. The Family Court Advisor who prepared the report, was "struck by the vehement hostility that [DMS] displayed about this father" and noted that DMS "used the same language and gave me the same examples of what he considered to be his father's inappropriate behavior as his mother had." *See Exhibit 1010* at p. 7. In another section of the report, the Advisor returns to this observation: "[T]he narrative that [DMS] has used when describing his

father . . . is almost word for word what his mother had told me and the same examples were used in order to demonstrate [David's] negative attitudes and behavior." *Id.* at p. 18. The Advisor was concerned that DMS "is becoming overly involved and responsible for how his mother feels and that this in turn is further damaging his relationship with his father." *Id.* While the Advisor ultimately concludes that it would be "harmful" to consider DMS living with David, it appears that conclusion is based in large part on Vickie having influenced DMS against David, not on misconduct on David's part toward DMS. Indeed, in a separate letter to the court, an Advisor concludes that there are "no significant safeguarding concerns in relation to the parties." *See Exhibit 1006* at p. 4.

The Court can find no evidence of grave risk in the CAFCASS reports or in the testimony of Dr. Freitas and Vickie. Accordingly, the Court rejects the grave risk defense.

## **Conclusion**

The Court finds that DMS, a minor child, was wrongfully removed from the United Kingdom under the terms of the Hague Convention and the International Child Abduction Remedies Act. The Court will grant the petition seeking to have DMS returned to the United Kingdom.

An agreement between the parties on the details of DMS's return is obviously the best solution. Counsel for the parties shall contact the Court (by contacting Law Clerk Dave Metcalf at 208-334-9025 or dave_metcalf@id.uscourts.gov) within five (5) days from the date of this decision about whether they were able to reach such an agreement. In the absence of an agreement within that five-day period, a compulsory remedy is set

**Findings of Fact & Conclusions of Law & Order – p. 11**

forth in the Order section below.  The Court will issue a separate Judgment as required by Rule 58(a).

## ORDER

In accordance with the Findings of Fact and Conclusions of Law set forth above,

NOW THEREFORE IT IS HEREBY ORDERED Petitioner-Plaintiff's Petition for Return of Child Pursuant to the Hague Convention (Docket No. 1) shall be, and the same is hereby, GRANTED.

IT IS FURTHER ORDERED that the parties shall attempt to reach agreement on the details of returning DMS to the United Kingdom.

IT IS FURTHER ORDERED, that counsel shall notify the Court within five (5) days from the date of this decision as to whether an agreement has been reached.

IT IS FURTHER ORDERED, that if no agreement is reached, the Court will impose the following requirements on the parties to govern the return of DMS to the United Kingdom.

IT IS FURTHER ORDERED, that DMS shall be returned to England, United Kingdom, to the temporary care of his father, David Neil Smith, pursuant to the Child Arrangements Orders previously entered by Family Court Norwich Sitting at King's Lynn on October 12, 2016 and March 30, 2017, FORTHWITH.  To facilitate this return, Ms. Vickie Michelle Smith is ordered to bring DMS before the Court at a time and place to be determined by the Court.  At that time, custody of DMS for purposes of the return will be transferred to counsel for Mr. David Smith.  Ms. Vickie Michelle Smith is ordered to bring the British and United States passports for DMS and provide them to counsel for

**Findings of Fact & Conclusions of Law & Order – p. 12**

Mr. David Smith to facilitate DMS's return to England.  Counsel for Mr. David Smith shall proceed to place DMS on the next reasonably available commercial air flight from Boise to London, England, making appropriate arrangements for DMS to travel as an unaccompanied minor.

      IT IS FURTHER ORDERED that Ms. Vicki Michelle Smith is directed to cooperate in the coordination and return of DMS to England.

      IT IS FURTHER ORDERED that within 14 days after DMS has been returned to England, Mr. David Smith may submit a motion for costs and fees, accompanied by a final list of his incurred expenses, including court costs, legal fees, foster home or other care during the course of proceedings in the action, and transportation costs related to the return of DMS

      IT IS FURTHER ORDERED that within 14 days after Mr. David Smith files his motion for costs and fees, Ms. Vickie Michelle Smith may file a response brief.

      IT IS FURTHER ORDERED that the United States Marshals service is directed to assist in the execution of this Order as necessary, and the United States Marshals Service may enlist the assistance of other law enforcement authorities, including the local police, as necessary to aid in any aspect of securing the safe return of DMS to England.

      IT IS FURTHER ORDERED that should Ms. Vickie Michelle Smith fail to produce DMS for the transfer of physical custody for return purposes as directed in this Order, Mr. David Smith is authorized to arrange for the pick-up of the child at the child's residence or school, using the assistance directed in the previous paragraph.  Following such pick-up, DMS should be returned as directed in paragraph 2 of this Order.

IT IS FURTHER ORDERED that this Order supersedes the Court's December 6, 2018 Memorandum Decision and Order (Docket No. 4) and the Parties' Stipulation (Docket No. 6) that DMS not be removed from the District of Idaho pending a determination on the merits of the Petition.

DATED: February 20, 2018

_____
B. Lynn Winmill
Chief U.S. District Court Judge